Gen. 419]                                                                    419

## SHERIFFS

### CONSTITUTIONAL LAW — APPOINTMENT AUTHORITY OF SHERIFF

August 17, 1994

*The Honorable R. Hunter Nelms*
*President*

*Mr. George N. Manis*
*Executive Director*
*The Maryland Sheriff's Association*

The Maryland Sheriff's Association has requested our opinion on several questions relating to the appointment authority of the sheriff. Specifically, you posed the following two groups of issues:

1. "Does a sheriff have appointing authority at the beginning of each term? If so, can he chose to appoint or not appoint a sworn employee with or without cause? If a sheriff chooses not to appoint a sworn deputy does the deputy still have a job or is he considered terminated? What, if any, are the legal consequences to the sheriff if he chooses not to appoint (re-appoint) the previously sworn deputy without cause?"

2. "Is the definition of a 'sworn deputy' properly defined by the appointment and oath administered by the sheriff at the beginning of each term or is the proper reference to 'sworn' deputy for purpose of appointment defined by completion of the Maryland Police Training Commission?"

For the reasons stated below, we conclude as follows:

1. In some Maryland counties, the tenure of deputy sheriffs expires at the end of the sheriff's term. Those deputies whom the sheriff decides to retain are reappointed at the beginning of the next term. Others end their service at that time. No cause need be stated for the sheriff's decision not to reappoint a deputy. Of course, a decision declining to reappoint a deputy may not be based on race, gender, the exercise of First Amendment rights, or any other factor impermissible under federal or State law.

The beginning of a sheriff's term is legally significant for purposes of appointment of deputy sheriffs, however, only in counties for which the General Assembly has not addressed by statute the tenure of deputy sheriffs. In other counties, a sheriff does not have appointing authority at the beginning of each term, because the General Assembly has granted deputies in those counties certain forms of job security that are inconsistent with the exercise of the sheriff's common law power.

2.    A "sworn deputy" is properly defined by the appointment and oath administered by the sheriff at the beginning of the deputy's term.

# I

## The Sheriff's Appointment Power

### A.    *Introduction*

Article IV, § 44 of the Maryland Constitution provides for the election of a sheriff in each county and Baltimore City. In the absence of a constitutional specification of the duties of the office, a sheriff exercises the powers and perform the duties prescribed by the common law, except as modified by statute. *See Soper v. Montgomery County*, 294 Md. 331, 337, 449 A.2d 1158 (1982); 79 *Opinions of the Attorney General* 83 (1994); 54 *Opinions of the Attorney General* 387, 389-90. (1969). Among the common law powers and duties of a sheriff was the duty to appoint, direct, and remove deputies. *Rucker v. Harford County*, 316 Md. 275, 290, 558 A.2d 399 (1989) (citing 1 *Anderson on Sheriffs, Coroners and Constables* §§60, 85, 145 (1941)).

Discussing the appointment power of the sheriff, Attorney General Burch pointed out that, because the sheriff was vested with the exclusive authority to appoint deputies who served only during the pleasure of the sheriff, "[i]t follows that both the appointment and tenure of deputies are discretionary with the sheriff." 58 *Opinions of the Attorney General* 708, 710 (1973). The Attorney General went on to say that "the particular matter of the appointment of deputy sheriffs is totally within the powers of

the sheriff ...." 58 *Opinions of the Attorney General* at 716. *See also* 80 C.J.S. *Sheriffs and Constables* §26(6) (1953).[1]

The common law duty of appointment has been regulated somewhat by the General Assembly. *See Rucker*, 316 Md. at 290; *Windsor v. Bozman*, 68 Md. App. 223, 228, 511 A.2d 69 (1986). For example, some county-specific portions of §2-309 of the Courts and Judicial Proceedings ("CJ") Article, Maryland Code, prescribe the number of deputies that a sheriff may appoint.

More pertinently, the General Assembly has, in certain counties, indicated its intention that deputy sheriffs enjoy some form of job security. The measure of security that a deputy sheriff enjoys varies from county to county, as reflected in various subsections of CJ §2-309, most of which incorporate the pertinent law of each county.[2] In addition, Article 25, §3(f) of the Code

---

[1] The appointment power must be exercised within the constraints of the United States and Maryland Constitutions and federal law. *See* Part IC below.

[2] In Allegany County, deputies "are under the county classified service." CJ §2-309(b)(2). In Anne Arundel County, "employees in the Sheriff's office shall be in the county merit system." §2-309(c)(3). In Baltimore City, deputies "are in the classified service of the State Personnel Management System." §2-309(d)(2). In Baltimore County, deputies "are subject to the provisions of the county merit system." §2-309(e). In Carroll County, deputies "may be disciplined or dismissed by the Sheriff in accordance with the Law Enforcement Officers' Bill of Rights or the personnel rules and regulations of Carroll County." §2-309(h)(2)(i). In Cecil County, "upon completion of the probationary period, deputies shall be subject to the Cecil County personnel regulations and policies on all matters." §2-309(i)(1)(vi)(2). In Frederick County, "all deputies are subject to the county personnel regulations with regard to hiring, promotion and compensation with regard to all matters not covered by the LEOBR." §2-309(l)(3). In Montgomery County, "personnel appointed by the Sheriff shall be considered for all purposes as Montgomery County merit system employees and subject to all rules and regulations of the Personnel Board of Montgomery County." §2-309(q)(3)(ii). In Prince George's County, upon completion of the probationary period, "deputy sheriffs ... shall be subject to the county personnel law." §2-309(r)(6)(i). In Washington County, "a deputy sheriff having the rank of lieutenant or below has tenure, and may be discharged by the Sheriff only for misfeasance, nonfeasance, or insubordination in

(continued...)

authorizes the county commissioners of Dorchester, Queen Anne's, and Somerset Counties to include employees of the sheriff's department within the merit system of those counties. We do not believe it to be appropriate for the Attorney General to explore in detail how each county's law would apply to deputy sheriffs, and it may be that a sheriff has broad discretion under a particular county's law. The General Assembly's enactment of a provision incorporating county law, however, displaces the sheriff's common law power and requires resort to the county law procedures governing appointments.

Similarly, in other counties deputy sheriffs receive job security pursuant to public local laws. In Charles County, "all of the members of the Sheriff's office, except the Sheriff, shall be subject [to the merit or classified system.]" Code of Charles County §125-4(K)(1). In St. Mary's County, "[e]xcept for the Sheriff, all personnel of the Sheriff's office shall participate in the merit system of St. Mary's County and shall be hired and governed by the rules of the system." St. Mary's County Code §120-2(A)(1).

In Caroline County, the personnel ordinance §§3-1 and 3-2, includes "law enforcement officers" in the Sheriff's department in the classified or merit system. This ordinance may supersede the sheriff's common law powers.

Finally, in several counties − Caroline, Garrett, Harford, Howard, Kent, Talbot and Worcester − we could find no provision

---

[2] (...continued)
office." §2-309(w). In Wicomico County, "all deputies ... are subject to the 'personnel provisions' of the charter of Wicomico County and subsequent rules and regulations passed by the County Council." §2-309(x)(5).

Although CJ §2-309 does not provide job security to deputy sheriffs in Calvert County, the deletion of certain language from CJ §2-309(f)(1) has been understood to authorize the Calvert County Commissioners to determine the personnel status of these deputies. *See* Chapter 232, Laws of Maryland 1976; Opinion No. 77-001 (January 6, 1977) (unpublished). We defer to the Calvert County Attorney with regard to the exact scope of the commissioners' authority and the current status of the deputies under local law.

displacing the common law rule that deputy sheriffs work at the pleasure of the sheriff.[3]

## B. *Exercise of Appointment Power at Beginning of Term*

At common law, the tenure of a deputy expired when the appointing sheriff's term expired. 63A Am. Jur. 2d *Public Officers and Employees* §569 (1984). In that situation, the newly elected or reelected sheriff has appointment power at the beginning of each term. Such is the case in some states. *See, e.g., Tanner v. McCall*, 625 F.2d 1183, 1186 (8th Cir.), *cert. denied*, 451 U.S. 907 (1981) (Florida statute reserved to the sheriff absolute control over selection and retention of deputies); *Ramey v. Harber*, 431 F. Supp. 657 (W.D. Va. 1977), *aff'd in part and rev'd in part on other grounds*, 589 F.2d 753 (4th Cir. 1978), *cert. denied*, 442 U.S. 910 (1979). In *Ramey*, the district court held that under a Virginia statute reflecting the common law rule, the term of deputies of constitutional officers, such as the sheriff, ends with the term of their principal, *i.e.*, the appointing sheriff. The federal court observed that "the automatic termination provisions could be employed by a newly elected Sheriff, or for that matter, a reelected incumbent ...." *Ramey*, 431 F. Supp. at 665. *See also Blackburn v. Brorein*, 70 So. 2d 293, 298 (Fla. 1954) ("[i]t was never contemplated that the sheriffs of the state must perform the powers and duties vested in them through deputies or assistants selected by someone else").

The General Assembly, while modifying the common law appointment power of sheriffs, has left it largely intact in many counties. *See Soper v. Montgomery County*, 294 Md. 331, 337, 597

---

[3] Chief deputy sheriffs in all counties work at the pleasure of the sheriff. In Howard County, moreover, the statute codifies the common law rule by providing a deputy holds his or her office at the pleasure of the sheriff and may be removed by the sheriff at any time. CJ §2-309(o)(1). *Accord, Ritchie v. Donnelly*, 324 Md. 344, 367, 447 A.2d 1158 (1991). In Charles County, the Board of Public Safety is clothed with the duty of appointment. CJ §2-309(j)(3).

We have not considered whether the budgetary process in any county might, as a practical matter, entail limitations on the exercise of the sheriff's discretion concerning appointments. Nor have we considered whether any personnel rules that a particular sheriff might have adopted would have the effect of constraining the sheriff's discretion.

A.2d 432 (1982). Thus, absent a statute changing the common law rule, a sheriff has power to appoint at the beginning of the sheriff's term of office. If, in the counties in which the common law rule prevails, a deputy sheriff is not reappointed, the deputy's service ends by operation of law. *Cf.* 68 *Opinions of the Attorney General* 315, 316 (1983) (county treasurer's unrestricted power to appoint "carries with it the power to remove," including employees appointed by predecessor).

In the counties where State or local law gives deputy sheriffs job security, however, the beginning of a sheriff's term does not constitute a legally significant event in terms of the appointment of a deputy sheriff, because the General Assembly *has* changed the common law rule. Simply put, a newly elected or reelected sheriff does not have the power to appoint new deputies or the power to "reappoint" current deputies in those counties where the General Assembly has provided deputies with tenure or has specified that deputies are to be governed by personnel systems that provide equivalent protection. If a deputy's position terminated when the appointing sheriff's term expired, the Legislature's undertaking to provide deputies with job security would be meaningless.

In counties with tenured deputies, the situation of a newly elected or a reelected sheriff is analogous that of a newly appointed superintendent of the Maryland State Police. When a new superintendent is appointed by the Governor, he or she does not have the authority to appoint new troopers and terminate the existing tenured troopers.[4] To be sure, if the need to appoint a deputy or trooper arises because of resignation, death, or for any other reason, the sheriff or superintendent possesses that power. The beginning of a term, however, does not constitute a legally significant event for purposes of appointments.

### C.     *Constitutional and Other Constraints on Discretion*

Even in those counties where the sheriff retains common law authority to discharge deputies without cause and to decline to reappoint deputies at the start of a new term, the sheriff may not exercise this authority for reasons prohibited by law. *Cf.* 68 *Opinions of the Attorney General* at 320-21 (county treasurer with

---

[4] The superintendent does have the authority to appoint employees in the manner prescribed by law. Article 88B, §15(b)(7).

unrestricted authority to remove employees may not remove employees in violation of clear public policy or of statutory or constitutional right). To take an egregious (and totally fictitious) example, suppose that a newly elected sheriff in a "common law" county announced that no female deputy would be reappointed. This decision would violate the Equal Rights Amendment, Article 46 of the Declaration of Rights, and Section 1983 of the federal civil rights laws. A number of other factors (race, for example, or reasonably accommodated disability) would likewise be unlawful as the basis for personnel decisions.

## 1. *First Amendment Dismissals*

Care must also be taken to avoid personnel decisions that evidence retaliation for a deputy sheriff's exercise of First Amendment rights. Government employees do not relinquish their First Amendment rights when the enter public service. *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968).[5] A government official may not discharge an employee if such discharge would infringe the employee's constitutionally protected right of freedom of speech. *Connick v. Meyers*, 461 U.S. 138, 143 (1983), or association, *Rutan v. Republican Party of Illinois*, 110 S. Ct. 2729, 2737 (1990). The General Assembly has codified this concern as it relates to law enforcement officers. *See* Article 27, §733 of the Code.[6]

"[U]nlike the citizenry-at-large, however, government employees are subject to the state's paramount interest in promoting the efficiency of the public services it performs through

---

[5] Under §3-202 of the State Personnel and Pensions ("SPP") Article, Maryland Code, "[e]mployment by this State does not affect any right or obligation of a citizen under the Constitution or laws" of the United States or Maryland.

[6] This section provides as follows:

> A law enforcement officer may not be discharged, disciplined, demoted or denied promotion, transfer or reassignment, or otherwise discriminated against in the regard to his employment or be threatened with any such treatment, by reason of his exercise of or demand for the rights granted in this subtitle, or by reason of the lawful exercise of his constitutional rights.

its employees." *Id. See also Pruitt v. Howard County Sheriff*, 96 Md. App. 60, 69, 623 A.2d 696, *cert. denied*, 332 Md. 143 (1993), *cert. denied*, 114 S. Ct. 1059 (1994); *Prince George's County v. Younkers*, 94 Md. App. 48, 54, 615 A.2d 1197 (1992). *Accord Waters v. Churchill*, 114 S. Ct. 1878, 1886 (1994) (government as employer has far broader powers in regard to employees' speech than does the government as sovereign).

In determining whether a public employee has been improperly discharged for engaging in protected speech, the court must make a threshold inquiry of whether the employee's speech addresses a matter of public concern. *Connick,* 461 U.S. at 146-54. *See also Waters*, 114 S. Ct. at 1884; *Berger v. Battaglia*, 779 F.2d 992, 998 (4th Cir. 1985), *cert. denied*, 476 U.S. 1159 (1986); *Hawkins v. Public Safety Dep't*, 325 Md. 621, 633, 602 A.2d 712 (1992); 68 *Opinions of the Attorney General* at 320. Once past this threshold, the court must strike a balance between the employee's interest in commenting on matters of public concern and the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. *See also Waters*, 114 S. Ct. at 1888 ("where government is employing someone for the very purpose of effectively achieving its goals, [restricting speech in the name of efficiency] may be appropriate."). *See, e.g., Berger*, 779 F.2d at 998 (officer's conduct in performing public entertainment in blackface while off duty was constitutionally protected speech, *i.e.*, artistic expression); *Hawkins*, 325 Md. at 633 (prison guard's abusive words and conduct directed toward private citizen did not address matter of public concern); *Pruitt*, 96 Md. App. at 69-70 (officers' conduct of uttering German words and phrases, clicking their heels together, and raising their arms in Nazi-like salutes did not address matter of public concern).

### 2.    *Patronage Decisions*

Personnel decisions, such as hiring, firing, promotion, transfer, and recall, that are based on patronage burden public employees' First Amendment rights to freedom of belief and association. *Rutan*, 110 S. Ct. at 2736. *See also Elrod v. Burns*, 427 U.S. 347, 359 (1976). The plurality in *Elrod*, declared that:

> Under    [patronage]    practice,    public
> employees hold their jobs on the condition
> that they provide, in some acceptable
> manner, support for the favored political

> party. The threat of dismissal for failure to provide that support unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise. The belief and association which government may not ordain directly are achieved by indirection. And regardless of how evenhandedly these restraints may operate in the long run, after political office has changed hands several times, protected interests are still infringed and thus the violation remains.

427 U.S. at 359-60 (footnote omitted).

The prohibition against patronage dismissals is not absolute. On this point, the Court said:

> [I]f conditioning the retention of the public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

427 U.S. at 363 (footnote omitted). The Court also held that limiting patronage dismissals to policymaking positions is sufficient to achieve the need for assurance that "representative government not be undercut by tactics obstructing the implementation of policies of the new administration." 427 U.S. at 372.

Four years later, in *Branti v. Finkel*, 445 U.S. 507 (1980), the Supreme Court clarified the analysis for determining the constitutionality of such dismissals. The Court refined and made explicit *Elrod's* policymaker/confidential employee exception to the otherwise categorical prohibition against patronage employment decisions. The Court, recognizing that party affiliation may be an acceptable requirement of some types of government employment, declared that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the

State's vital interest in maintaining governmental effectiveness and efficiency." 445 U.S. at 517. The test is a functional one:

> In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

455 U.S. at 518.

Dismissals based on either the presence or absence of political loyalty to a particular candidate, as opposed to a political party, also raise First Amendment concerns. *See, e.g., Upton v. Thompson*, 930 F.2d 1209 (7th Cir. 1991), *cert. denied*, 112 S.Ct. 1262 (1992) (a sheriff may use political considerations when determining who will serve as a deputy sheriff); *Soderstrum v. Town of Grand Isle*, 925 F.2d 135 (5th Cir. 1991) (chief of police could fire personal secretary who supported outgoing chief of police because position was one of confidence); *Matherne v. Wilson*, 851 F.2d 752 (5th Cir. 1988) (sheriff not justified in firing deputy for actively supporting campaign of opponent); *McBee v. Jim Hogg County*, 703 F.2d 834, 838 (5th Cir. 1983), *vacated on other grounds*, 730 F.2d 1009 (1984) (en banc) (deputy sheriffs fell within *Elrod-Branti* exception). *Accord Wilbur v. Mahan*, 3 F.3d 214 (7th Cir. 1993) (sheriff could restrict free speech right of deputy sheriff, who was policy-making employee, by placing him on unpaid leave based on disruptive potential of deputy's candidacy).

We are not able to offer general guidance beyond this discussion of the applicable constitutional test.[7] The answer to whether the First Amendment allows a deputy sheriff to be dismissed because of the deputy's support of an opponent requires an assessment of the particulars of the situation, especially the

---

[7] We also note that SPP §3-203 authorizes all State employees to "freely participate in any political activity and express any political opinion." The same section protects employees from being "required to provide any political service." The statute does not specify the consequences for an employer's violation of SPP §3-203. *See also* SPP §§3-205(1) (prohibiting political activity on the job) and 3-206 (protecting employees against demands for political contributions).

exact nature of the working relationship between the sheriff and the deputy.

## II

### Sworn Deputy

You also ask whether the definition of a "sworn deputy" is properly defined by the appointment and oath administered by the sheriff at the beginning of each term or whether the proper reference to "sworn deputy" for purpose of appointment is defined by completion of the Maryland Police Training Commission standards.

CJ §2-104(b) provides that "[e]very deputy ... sheriff shall take and subscribe [a specified] oath or affirmation ...."[8]  It is mandatory that a deputy sheriff take the oath. *See Blumenthal v. Clerk of Court of Anne Arundel County*, 278 Md. 398, 408, 365 A.2d 279 (1976) (use of the word "shall" ordinarily imports a mandatory result).  Article 41, §4-201(d)(6)(i) provides that an individual who satisfactorily meets the standards of the Maryland Police Training Commission will be certified as a police officer and receive a certificate to that effect.  *See* Article 41, §4-201(k). Article 41, §4-201 does not require an individual to signify to be bound in conscience to perform an act in order to be certified.  In short, the certification law contains no requirement that an individual take an oath.

Accordingly, a deputy does not become a "sworn deputy" by satisfying the standards of the Maryland Police Training Commission.  Instead, a deputy becomes a "sworn deputy" once he or she takes the oath provided in CJ §2-104(b).

---

[8] The oath states:

> I A.B., do swear (or affirm) that I will not for lucre or malice delay any person applying to me for any business belonging to the office I officiate in, and that I will not directly or indirectly ask, take, exact, demand, or receive from or charge to any such person to may own use any fee or reward whatsoever for any services I may do as deputy of said office, and that in making out the office fees I will not wittingly or willingly charge other or higher fees than are allowed by law.

## III

## Conclusion

In sum, it is our opinion that a sheriff has appointment power at the beginning of each term except in those counties where deputies have statutory job security. In those counties where a sheriff has appointment power at the beginning of the term, that power may not be exercised for reasons prohibited by State or federal constitution or statute. In addition, a "sworn deputy" is properly defined by the appointment and oath administered by the sheriff at the beginning of the deputy's term.

J. Joseph Curran, Jr.
*Attorney General*

Kimberly Smith Ward
*Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions & Advice*